*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re Parole of FREDERICK WILKINS.

MONROE COUNTY PROSECUTING ATTORNEY,

UNPUBLISHED
March 26, 2019

Appellee,

v

No. 344426
Monroe Circuit Court
LC No. 18-140703-AP

FREDERICK WILKINS,

Appellee,

and

PAROLE BOARD,

Appellant.

Before: O'BRIEN, P.J., and JANSEN and RONAYNE KRAUSE, JJ.

PER CURIAM.

The Michigan Parole Board (the Board) appeals as on leave granted[1] the trial court's order reversing the Board's grant of parole to appellee, Frederick Wilkins (Wilkins). The Board argues that the trial court erred in relying on an order of the Wayne Probate Court finding Wilkins to be a person requiring involuntary mental health treatment. Specifically, the Board contends that the trial court improperly found the Board's grant of parole to be a clear abuse of discretion on the grounds that the probate court order established that Wilkins would be a

---

[1] *In re Parole of Frederick Wilkins*, ___ Mich ___; 920 NW2d 138 (2018) (Docket No. 158396).

menace to society and the public safety on parole. For the following reasons, we vacate and remand for further proceedings.

## I. FACTS

This case arises out of a particularly brutal assault committed in 1988 by Wilkins against his wife after she initiated divorce proceedings against him. Wilkins grabbed his wife by her hair, choked her, and punched her several times before knocking her head against a landscaping boulder near their driveway. Wilkins then proceeded to kick his wife several times with the heel of his shoe before a passer-by intervened. Wilkins then got into his car and drove it over his wife, dragging her into the road; Wilkins then reversed direction, ran over her a second time, and drove off. That same day, Wilkins turned himself in, stating that he had choked and beaten his wife as she repeatedly told him that she loved him. The officers taking down the report noted that Wilkins took great delight in describing the details, and Wilkins also said that they could contact his wife's parents to tell them that Wilkins had finally killed their daughter. Wilkins's wife did not die, but was hospitalized for three months, underwent plastic surgery, and needed six months before she could walk without assistance again. Wilkins was convicted by a jury of assault with intent to murder, MCL 750.83, and was sentenced to 30 to 60 years' imprisonment.

For the first ten years of his prison sentence, Wilkins received numerous misconduct reports from the Michigan Department of Corrections for a variety of reasons, including violent and aggressive behavior. When Wilkins became eligible for parole in 2014, the Board declined to grant parole twice over the course of two years. In 2017, however, the Board found that Wilkins would not be a menace to society or to the public safety were he to return to society. Before entering an order for parole, however, the Board obtained from the probate court an order requiring Wilkins to participate in outpatient mental health treatment for up to 180 days. The order also included a stipulation that Wilkins could reasonably be expected to harm himself or others in the near future, was unable to attend to his basic physical needs, and was unable to understand his need for treatment such that he posed a substantial risk of physical harm to himself or others.

The prosecution promptly appealed the grant of parole to the trial court, due to the circumstances of the crime, lack of remorse, Wilkins's psychiatric condition, and Wilkins's violent tendencies. The prosecution contended that Wilkins would be a menace to society and/or public safety if parole were granted. The trial court agreed, noting that the most troubling fact presented was that a mere 180 days of outpatient treatment was insufficient under these circumstances. The Board then appealed to this Court, which denied leave. The Supreme Court subsequently remanded the case to this Court for consideration as on leave granted on an expedited basis.

## II. STANDARD OF REVIEW

" 'Judicial review of the Board's decision to grant parole is limited to the abuse-of-discretion standard.' " *In re Parole of Spears*, 325 Mich App 54, 59; ___ NW2d ___ (2018), quoting *In re Parole of Elias*, 294 Mich App 507, 538; 811 NW2d 541 (2011). "[T]he challenging party has the burden to show either that the Board's decision was a clear abuse of discretion or was in violation of the Michigan Constitution, a statute, an administrative rule, or a

written agency regulation." *Elias*, 294 Mich App at 538 (quotation marks and citation omitted); MCR 7.118(H)(3). An abuse of discretion occurs when a "decision falls outside the range of reasonable and principled outcomes." *Spears*, 325 Mich App at 59, quoting *Elias*, 294 Mich App at 538.

"[M]atters of parole lie solely within the broad discretion of the [Board]." *Elias*, 294 Mich App at 521 (quotation marks and citations omitted; second alteration in original). "Importantly, a reviewing court may not substitute its judgment for that of the Board." *Elias*, 294 Mich App at 538-539, citing *Morales v Parole Board*, 260 Mich App 29, 48; 676 NW2d 221 (2003). "[T]here is no abuse of discretion when a court or fact-finder is faced with conflicting information and makes a reasonable and principled decision regarding which side to believe." *Elias*, 294 Mich App at 546. "Because an abuse of discretion standard contemplates that there may be more than a single correct outcome, there is no abuse of discretion where the evidentiary question is a close one." *People v Smith*, 282 Mich App 191, 194; 772 NW2d 428 (2009), citing *People v Smith*, 456 Mich 543, 550; 581 NW2d 654 (1998).

Despite the broad discretion afforded it, however, the Board is constrained by MCL 791.233(1)(a), which provides that "[a] prisoner must not be given liberty on parole until the board has reasonable assurance, after consideration of all of the facts and circumstances, including the prisoner's mental and social attitude, that the prisoner will not become a menace to society or to the public safety." Additionally, the Board is prohibited from granting parole unless it "has satisfactory evidence that arrangements have been made for . . . the prisoner's care if the prisoner is mentally or physically ill or incapacitated." *Elias*, 294 Mich App 522 (quotation marks omitted), citing MCL 791.233(1)(e).

This Court reviews de novo any questions of law or legal analysis performed by the circuit court. *Morales*, 260 Mich App at 33, 37, 42, 45, 49. A trial court's factual findings are reviewed for clear error, and this Court will set them aside only if we are definitely and firmly convinced that the trial court made a mistake. *Vanzandt v State Employees Retirement Sys*, 266 Mich App 579, 585; 701 NW2d 214 (2005). Accordingly, an appellate court reviews for clear error a lower court's determination of whether an administrative board abused its discretion. See *Marrs v Bd of Medicine*, 422 Mich 688, 693-695; 375 NW2d 321 (1985); *Vanzandt*, 266 Mich App at 585.

### III. ANALYSIS

### A. RELIANCE ON THE TREATMENT ORDER

The Board contends that the trial court erred in deeming the probate court's treatment order to be evidence that the Board abused its discretion, and also that the trial court came to a number of erroneous conclusions based upon the probate court's order. We agree only that a treatment order may not be relied upon exclusively.

The probate court's finding that Wilkins was a danger to himself or others as a result of mental illness is not evidence *in and of itself* that Wilkins would be a menace to society or the public safety for the purposes of parole. The Board contends that it must petition for involuntary

mental health treatment before paroling an individual the Board believes requires treatment. MCL 791.235(11) provides:

> The department shall file a petition to the appropriate court under section 434 of the mental health code, 1974 PA 258, MCL 330.1434, for any prisoner being paroled or being released after serving his or her maximum sentence whom the department considers to be a person requiring treatment. The parole board shall require mental health treatment as a special condition of parole for any parolee whom the department has determined to be a person requiring treatment whether or not the petition filed for that prisoner is granted by the court.

The requirement that the Board petition the probate court for a treatment order before releasing any mentally ill prisoner also promotes compliance with MCL 791.233(1)(e), which requires the Board have evidence that care for a mentally ill prisoner has been arranged prior to granting that prisoner parole.

In order for the probate court to compel treatment, it must find that the subject of the petition is a "person requiring treatment." MCL 330.1468(2).[2] A "person requiring treatment" is defined as any of the following:

> (a) An individual who has mental illness, and who as a result of that mental illness can reasonably be expected within the near future to intentionally or unintentionally seriously physically injure himself, herself, or another individual, and who has engaged in an act or acts or made significant threats that are substantially supportive of the expectation.

> (b) An individual who has mental illness, and who as a result of that mental illness is unable to attend to those of his or her basic physical needs such as food, clothing, or shelter that must be attended to in order for the individual to avoid serious harm in the near future, and who has demonstrated that inability by failing to attend to those basic physical needs.

> (c) An individual who has mental illness, whose judgment is so impaired by that mental illness that he or she is unable to understand his or her need for treatment, and whose impaired judgment, on the basis of competent clinical opinion, presents a substantial risk of significant physical or mental harm to the individual in the near future or presents a substantial risk of physical harm to others in the near future. [MCL 330.1401(1)(a), (b), and (c).[3]]

_____

[2] MCL 300.1468 was recently amended, but the amendment does not take effect until March 28, 2019. 2018 PA 593, enacting § 468. Nothing in the statute relevant to this case was modified.

[3] MCL 330.1401 was recently amended such that subsection (c) now reads:

> (c) An individual who has mental illness, whose judgment is so impaired by that mental illness, and whose lack of understanding of the need for treatment has

In this case, Wilkins stipulated to the probate court's finding that subsections (a), (b), and (c) applied to him. The trial court then held that the Board failed to consider the probate court's finding, which evidenced that Wilkins would become a menace to society or to the public safety if he were to be paroled.

The process prescribed by statute, whereby the Board may be required to petition for mental health treatment prior to granting parole, must be intended to serve a purpose. To allow a probate court's finding that a parolee requires treatment—particularly where that finding was made on a petition from the Board—to be used as *per se* evidence that an individual poses a danger to society for the purposes of parole, could render the statute nugatory. See *People v Pinkney*, 501 Mich 259, 283; 912 NW2d 535 (2018) (explaining that this Court strives to avoid rendering any part of a statute nugatory). There would be no purpose in the Legislature requiring the Board to petition for mental health treatment prior to releasing certain prisoners if the resulting treatment order functioned to invalidate a grant of parole. In other words, the Mental Health Code creates a statutory scheme to ensure that qualifying individuals with mental illness may be obligated to comply with treatment for the safety of themselves or others.

However, the trial court is only precluded from relying *exclusively* on the existence of a treatment order. It is appropriate for the trial court to consider the contents of any such order in addition to other available facts and circumstances. Although the trial court relied more heavily on the treatment order than was proper, the court also considered Wilkins's history of violence both in and out of incarceration and the brutality of the offense when making its decision. Because the court did not use the treatment plan as *per se* evidence that Wilkins would be a menace to society and/or public safety, we cannot find that it clearly erred.

The Board also contends that the trial court erroneously focused on the fact that the initial treatment order would expire after 180 days. The Board accurately points out that the 180-day limit is only an initial limitation mandated by statute under the Health Code, and that time is subject to extensions. However, the trial court reasonably found concerning the possibility, under the circumstances, that it might *not* be extended. Furthermore, the trial court reasonably found concerning the outpatient nature of the treatment, noting that "he's on his own to go to the place." As with our analysis above, the mere fact that the required treatment is for only 180 days or to be on an outpatient basis is not *per se* grounds for finding an abuse of discretion by the parole board. However, it is clear that the trial court considered the contents of the treatment

---

caused him or her to demonstrate an unwillingness to voluntarily participate in or adhere to treatment that is necessary, on the basis of competent clinical opinion, to prevent a relapse or harmful deterioration of his or her condition, and presents a substantial risk of significant physical or mental harm to the individual or others. [2018 PA 593, enacting § 401(1)(c).]

The amendment is not effective until March 28, 2019. 2018 PA 593.

order in context and in light of other established facts regarding Wilkins specifically. The trial court did not clearly err in so doing.

## B. SURROUNDING FACTS AND CIRCUMSTANCES

Having found that the trial court did not clearly err in relying on the treatment order in context, we must additionally consider whether the trial court clearly erred in finding that the Board abused its discretion on the basis of the totality of the evidence and circumstances. We conclude that the trial court's concerns are reasonable, but it appears that the trial court overlooked one critical piece of evidence. We are therefore constrained to vacate the trial court's order and remand for its reconsideration.

As noted by the prosecution, Wilkins's crime was heinous, and Wilkins made a number of statements while in prison suggesting that he lacked remorse for the crime. For example, in 2010, Wilkins submitted an application for a pardon or commutation of his sentence, explaining:

> I was going through a divorce with my wife of eighteen years. I was ordered out of my house by the court system. My wife didn't want to be fair about the divorce settlement. She wanted the house and everything that we owned. She also wanted my pention [sic] benefits. You might say that she was taking me to the cleaners. I worked very hard for those eighteen years and I wanted something to show for it.[4]

> * * *

> I am requesting a pardon or commutation because I feel that I have done enough time for what happened 22 years ago. It was truly a bad crime. I was in bad shape mentally and really had no control over what I did at the time of the crime. I pled temporary insanity and had a doctor of psychiatry witness that I was insane at the time of the crime. I should have been put in a mental hospital so I could get the help I needed.

Attached to Wilkins's application was an addendum further explaining the circumstances of the crime from his perspective, in which Wilkins described that, at one point the victim was bleeding so badly that "her whole face was full of blood and her eye sockets were pools of blood," and that "[a]t the time[, Wilkins] thought that [he] had never seen anything so beutiful [sic]."

In a report authored by a therapist regarding Wilkin's engagement in group therapy in 2011, the therapist indicated:

> Throughout Mr. Wilkins's homework, he presented as showing no remorse for his actions and wrote "I thought she deserved all I did to her and

---

[4] This quotation reflects our reading of Wilkins's handwritten statement, rather than the prosecution's reading.

more. I was so enraged at her that I wanted to kill her over and over and over and over. I wanted to see her blood. I was blood thirsty. I wanted to drink her blood and eat her flesh. She hurt me really bad. Payback is a B***h!" In group discussion he presented as quite the opposite of these statements and stated "I still can't believe I did it. All I have left now is feeling sorry I did it." He acknowledges "my thinking was really rotten." He also reports being under the influence of alcohol at the time of his offense. He has a history of aggressive behavior when not on psychiatric medications. These two things, along with a deep hatred against the actions of his ex-wife in divorcing him, most likely influenced his thinking and actions at the time of this offense.

In a more recent qualified mental health professional evaluation (QMHPE), it was indicated that Wilkins's "blunt affect and lack of remorse for his crime were of major concern," although he was able to remain psychiatrically stable when placed in a structured environment with medication compliance. In an annual assessment of Wilkins conducted on December 13, 2017, it was noted that Wilkins "stated in the past that he hasn't had any symptoms in over 30 years and attributed this to his faith in God. He has also stated that he thinks he would continue to do well without medications and that he has been on his medications for so long it is difficult to know how they are helping him." The prosecution contends this is evidence that Wilkins will fail to take his medication on parole and become a menace to society.

We are inclined to agree. In particular, Wilkins's implied statement that he is likely to discontinue taking his medications severely undermines the otherwise positive fact that he has no recent serious misconduct tickets, and it totally belies any claim that Wilkins can or should manage his medications on his own. We could not find that the trial court clearly erred in determining that, under the circumstances, the Board abused its discretion in granting parole to a person who is obviously profoundly dangerous but for his medication and a controlled environment, where that person seemingly intends to discontinue that medication, and the only guaranteed oversight is a brief outpatient program. Necessarily implicit in the trial court's finding is that Wilkins simply must have more intensive monitoring and a more structured environment, with which we completely agree.

Our concern is that the Board allegedly *did* establish a mandatory structured and monitored living environment for Wilkins upon his release. The trial court noted the allegation but stated that it could not find any evidence of such a program in the files it reviewed. We are sympathetic: the "Central Office file" we received is voluminous, none of the documents contained therein are clearly labeled and certainly none are tabbed, and the internally included attachments make it exceedingly difficult to search by date. With difficulty, however, we did find a copy of the December 14, 2017, "Aftercare Needs Assessment and Plan" document that the Board attached to its motion in the trial court in support of the existence of such a program. Trial courts are not obligated to scour their records in support of a party's argument on a motion. See *Marnard Mfg Co, Inc v Gates Performance Engineering, Inc*, 285 Mich App 362, 377; 775 NW2d 618 (2009). Nonetheless, the Board attached a copy to its brief, and it does indicate that Wilkins would be required to reside at "Better Days Aftercare," which is allegedly "an intensive

SIL[5] setting that provides 24-hour staffing, medication dispensing and monitoring, [and] assistance with meals and transportation." Although understandable, the trial court erred in finding *no* support for the allegation that Wilkins "will go out into some kind of a structured program."

Nevertheless, we cannot hold on this record that it would be necessarily improper for the trial court to continue to find an abuse of discretion by the Board. We decline to make further findings, nor will we speculate as to what findings the trial court might have drawn had it been aware that there was additional evidence in the record that Wilkins would undergo closer and more ongoing scrutiny upon release. It would not be unreasonable for the trial court to require further information about the aftercare program, including, for example, a more detailed analysis of the extent and nature of the oversight that will be imposed. It would also not be unreasonable for the trial court to require further assurances regarding how long Wilkins would be required to remain in that program, including whether the Board can guarantee ongoing treatment as is clearly necessary. Indeed, the trial court could reasonably require any other information it deems relevant to assess whether this particular program is appropriate in light of the various disturbing details we know about Wilkins. Nevertheless, we cannot uphold the trial court's order where the trial court found *no* record evidence that such program exists when it apparently does.

## IV. CONCLUSION

The trial court did not rely exclusively on the probate court's treatment order, so it did not clearly err in considering that order in context. Given the ample other evidence suggesting that Wilkins would become a menace to society and/or to the public safety, we ordinarily could not say that the trial court clearly erred in finding that the Board abused its discretion in granting parole. However, the trial court's finding was premised on the misapprehension that there was *no* evidence showing that Wilkins would be placed into a more controlled and supervised environment than merely outpatient mental health services. We must therefore require the trial court to reconsider its findings in light of this additional evidence, and in light of whatever other information, if any, the trial court might require regarding the supervision Wilkins will receive if he is released. We impose no restrictions upon the trial court in carrying out that analysis and leave to the trial court's discretion whether to require further briefing, whether to decide the matter on the record as it presently exists, or otherwise how to proceed after remand.

The trial court's order reversing the grant of parole is vacated, and the matter is remanded for further consideration and proceedings not inconsistent with this opinion. The order granting parole is stayed pending the outcome of the trial court's further consideration. We retain jurisdiction.

/s/ Colleen A. O'Brien
/s/ Kathleen Jansen
/s/ Amy Ronayne Krause

---

[5] It appears that "SIL" stands for "structured independent living."

# Court of Appeals, State of Michigan

# ORDER

In re Parole of Frederick Wilkins

Docket No. 344426

LC No. 18-140703-AP

Colleen A. O'Brien
Presiding Judge

Kathleen Jansen

Amy Ronayne Krause
Judges

Pursuant to the opinion issued concurrently with this order, this case is REMANDED for further proceedings consistent with the opinion of this Court. We retain jurisdiction.

Proceedings on remand in this matter shall commence within 28 days of the Clerk's certification of this order, and they shall be given priority on remand until they are concluded. The trial court shall reconsider its findings and ultimate conclusion as to its review of the grant of parole in this matter consistent with our opinion. As stated in our opinion, the Parole Board's grant of parole is stayed pending the outcome of the trial court's further consideration of this matter.

The parties shall promptly file with this Court a copy of all papers filed on remand. Within seven days after entry, appellant shall file with this Court copies of all orders entered on remand.

The transcript of all proceedings on remand shall be prepared and filed within 21 days after completion of the proceedings.

/s/ Colleen A. O'Brien

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

March 26, 2019
Date

Chief Clerk