*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DAVID LEROY BENNETT, also known as DAVID LENORY BENNETT,

Defendant-Appellant,

and

MICHIGAN PROTECTION AND ADVOCACY SERVICE INC,

Amicus Curiae.

FOR PUBLICATION
January 21, 2021
9:05 a.m.

No. 350649
Wayne Circuit Court
LC No. 72-055257-01-FH

Before: SWARTZLE, P.J., and BECKERING and GLEICHER, JJ.

GLEICHER, J.

David Bennett was 17 years old when he stabbed Vivian Berry to death. The jury rejected his insanity defense and convicted him of first-degree murder. The trial judge sentenced Bennett to life imprisonment without parole, as required under Michigan law.

Forty years later, the United States Supreme Court held that when imposed on a juvenile, a mandatory sentence of life without parole constitutes cruel and unusual punishment under the Eighth Amendment. *Miller v Alabama*, 567 US 460, 465; 132 S Ct 2455; 183 L Ed 2d 407 (2012). The Supreme Court later imbued *Miller* with retroactive effect, entitling Bennett to a resentencing hearing. *Montgomery v Louisiana*, 577 US ___; 136 S Ct 718, 734; 193 L Ed 2d 599 (2016). On resentencing, the judge determined that because Bennett is mentally ill—a condition that remained undiagnosed and untreated until Bennett's incarceration—he "might" be unable to care for himself if released. For that reason, the judge opted to reimpose a life-without-parole sentence.

-1-

The resentencing court improperly employed Bennett's mental illness as a factor weighing against his release and compounded that error by relying on speculation, not evidence. We vacate Bennett's sentence and remand for resentencing to a term of years.

## I. LEGAL CONTEXT

Anticipating that the United States Supreme Court would give *Miller* retroactive effect, Michigan's Legislature designed a system for resentencing all prisoners serving life without parole who were under the age of 18 when they committed the offense. MCL 769.25a. In such cases, the resentencing court must select either life without parole or a term-of-years sentence. MCL 769.25a(2). Prosecutors seeking imposition of a life-without-parole sentence are obligated to file a motion specifying the grounds for imposing that punishment. MCL 769.25a(4)(b). The resentencing court then must hold a hearing to consider the juvenile sentencing factors set forth in *Miller* and other relevant information, including the defendant's "record while incarcerated." MCL 769.25(6). The court is additionally obligated to "specify on the record the aggravating and mitigating circumstances considered by the court and the court's reasons supporting the sentence imposed." MCL 769.25(7). If the court elects a term-of-years sentence rather than life without parole, "the court shall sentence the individual to a term of imprisonment for which the maximum term shall be not less than 60 years and the minimum term shall be not less than 25 years or more than 40 years." MCL 769.25(9). Bennett has served seven years more than the longest minimum term allowable under the statute.

At a resentencing hearing, MCL 769.25 requires that the judge take into account the "hallmark features" of youth, known as the *Miller* factors. The *Miller* factors developed from the Eighth Amendment proportionality principles described by the United States Supreme Court in other decisions involving juvenile sentencing: *Roper v Simmons*, 543 US 551; 125 S Ct 1183; 161 L Ed 2d 1 (2005), and *Graham v Florida*, 560 US 48, 68; 130 S Ct 2011; 176 L Ed 2d 825 (2010). The Court observed in *Graham* and repeated in *Miller* that "[t]he concept of proportionality is central to the Eighth Amendment." *Graham*, 500 US at 59; *Miller*, 567 US at 469. That concept, the Court emphasized in *Miller*, must be viewed in a manner that gives meaning to "the evolving standards of decency that mark the progress of a maturing society." *Miller*, 567 US at 469 (quotation marks and citations omitted).

Those evolving standards have led to a recognition that "imposing the death penalty for nonhomicide crimes against individuals, or imposing it on mentally retarded defendants, violates the Eighth Amendment." *Id*. at 470. In line with these precepts, *Roper* held that the Eighth Amendment categorically prohibits imposing the death penalty on defendants who were under 18 years old when the crime was committed, and *Graham* barred life without parole sentences for juvenile nonhomicide offenders. *Miller*, 567 US at 470. "[T]he confluence of these two lines of precedent" led the Supreme Court to conclude in *Miller* "that mandatory life-without-parole sentences for juveniles violate the Eighth Amendment." *Id*.

*Miller*'s holding is grounded in the propositions that "children are constitutionally different from adults for purposes of sentencing," "have diminished culpability and greater prospects for reform," and "are less deserving of the most severe punishments." *Id*. at 471 (quotation marks and citation omitted). The "distinctive attributes of youth" render the customary penological justifications for harsh sentencing—retribution, deterrence, and incapacitation—far less relevant

-2-

in the context of minors. *Id*. at 472-473. Rather than focusing on that traditional trio of sentencing factors, *Miller* requires judges to bear in mind that youth "is a time of immaturity, irresponsibility, impetuousness[,] and recklessness." *Id*. at 476 (quotation marks and citation omitted). These qualities, the Court stressed, are almost always "transient." *Id*.

The Court additionally pointed out that childhood is a time when we are " 'most susceptible to influence and to psychological damage.' " *Id*., quoting *Eddings v Oklahoma*, 455 US 104, 115; 102 S Ct 869; 71 L Ed 2d 1 (1982). *Eddings* was "especially on point," in the Court's view, *Miller*, 567 US at 476, and it is particularly pertinent here, too. The 16-year-old defendant in *Eddings* entered a nolo contendere plea to the first-degree murder of a police officer, putting him at risk of the death penalty. *Eddings*, 455 US at 106. At the sentencing hearing, he presented evidence that he had been severely abused by his parents and was mentally and emotionally "disturbed." *Id*. at 107. Although the Supreme Court did not use the term "mental illness," the description of the defendant's condition is consistent with that phrase.[1]

The sentencing judge weighed Eddings's youth as a strong mitigating factor but refused to consider the "fact" of Eddings's "violent background" or his psychological or emotional disorders. *Id*. at 109. The Oklahoma appellate court "conceded that Eddings had a 'personality disorder,' but cast this evidence aside on the basis that 'he knew the difference between right and wrong . . . and that is the test of criminal responsibility.' " *Id*. at 113.

The Supreme Court reversed, vacating Eddings's death sentence and ordering that on remand "all relevant mitigating evidence" be considered. *Id*. at 117. The Court had "no doubt that evidence of a turbulent family history, of beatings by a harsh father, and of severe emotional disturbance is particularly relevant," *id*. at 115, reasoning:

> Eddings was not a normal 16-year-old; he had been deprived of the care, concern, and paternal attention that children deserve. On the contrary, it is not disputed that he was a juvenile with serious emotional problems, and had been raised in a neglectful, sometimes even violent, family background. In addition, there was testimony that Eddings'[s] mental and emotional development were at a level several years below his chronological age. All of this does not suggest an absence of responsibility for the crime of murder, deliberately committed in this case. Rather, it is to say that just as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must the background and mental and emotional

---

[1] Testimony at the sentencing hearing revealed "that Eddings was emotionally disturbed in general and at the time of the crime, and that his mental and emotional development were at a level several years below his age. A state psychologist stated that Eddings had a sociopathic or antisocial personality and that approximately 30% of youths suffering from such a disorder grew out of it as they aged." *Eddings v Oklahoma*, 455 US 104, 107; 102 S Ct 869; 71 L Ed 2d 1 (1982) (citation omitted). According to a psychiatrist, "Eddings could be rehabilitated by intensive therapy over a 15- to 20-year period." *Id*. The psychiatrist suggested that, if treated, Eddings "would no longer pose a serious threat to society." *Id*. at 108.

development of a youthful defendant be duly considered in sentencing. [*Id*. at 16.][2]

*Miller*'s citation to and specific reliance on *Eddings* informs our approach to this case. It is beyond dispute that the "qualities of youth" encapsulated in the *Miller* factors include untreated mental illness born of an abusive childhood or exacerbated by living in an abusive home.

*Miller* details the many reasons that precedent, science and common sense mandate that juvenile homicide offenders be approached differently than adults for sentencing purposes. The Court adopted several guideposts that must inform a judge's sentencing evaluation. These factors apply in both initial sentencings and in resentencing hearings necessitated by *Montgomery*. Specifically, before resentencing an adult to life without parole a court must still consider "the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional," "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him," that a youthful offender "might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys" and "the possibility of rehabilitation[.]" *Miller*, 567 US at 477-478.

In addition to these factors, the judge may consider "the traditional objectives of sentencing or other factors[.]" *People v Garay*, ___ Mich ___; 949 NW2d 673 (Docket No. 155886, 2020). The principles that guide proportional sentencing in our state are: "(a) the reformation of the offender, (b) protection of society, (c) the disciplining of the wrongdoer, and (d) the deterrence of others from committing like offenses." *People v Snow*, 386 Mich 586, 592; 194 NW2d 314 (1972).

This Court's holding in *People v Garay*, 320 Mich App 29; 903 NW2d 883 (2017), and its modification by our Supreme Court, also have special relevance here. Not long after *Miller* was decided, the defendant in *Garay* was convicted of first-degree murder and sentenced to life without parole. *Garay*, 320 Mich App at 43. Although the trial court expressed awareness of *Miller* and acknowledged that it was bound to consider the *Miller* factors, the judge "also stated that it had to consider the goals of sentencing: rehabilitation, punishment, deterrence, protection, and retribution." *Id*. at 47. This Court held that the judge had improperly applied *Miller* by finding that none of the *Miller* factors applied and relying instead on the *Snow* factors. We explained that the trial court "implie[d] a belief that a life-without-parole sentence can or should be imposed unless there is a mitigating factor not to impose the sentence." *Id*. at 49. By failing to consider whether the defendant "was and would remain wholly incapable of rehabilitation for the remainder of his life," the trial court had abused its discretion, we held. *Id*. On remand, we instructed that "*Miller* and *Montgomer*y caution against the imposition of a life-without-parole sentence except

[2] Today, "[a]ll death penalty states allow a defendant to present mitigating evidence of mental illness to the jury as a reason not to impose a sentence of death." Entzeroth, *The Challenge and Dilemma of Charting a Course to Constitutionally Protect the Severely Mentally Ill Capital Defendant From the Death Penalty*, 44 Akron L Rev 529, 566 (2011).

in the rarest of cases and operate with the understanding that, more likely than not, a life-without-parole sentence is a disproportionate sentence for defendant." *Id*. at 50.

The Supreme Court reversed, but only to the extent that this Court's opinion "would broadly preclude sentencing courts from considering, at all, the traditional objectives of sentencing—punishment, deterrence, protection, retribution, and rehabilitation—when considering whether to sentence persons who were under the age of 18 when they committed their offenses to a term of life without parole." *Garay*, ___ Mich at ___; 949 NW2d at 674. The Court's brief order added: "Although reliance on other criteria to the exclusion of, or without proper consideration of, *Miller v Alabama* . . . would be an abuse of discretion, mere consideration of the traditional objectives of sentencing or other factors is not, per se, an error of law." *Id*.

When applied to a juvenile offender being sentenced for the first time, the *Miller* factors require a court to examine an offender's childhood and to use information gathered about the child's past to make an informed prediction about whether the child can be rehabilitated. Thoughtful application of the concepts described in *Miller* permits a court to distinguish between "the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Miller*, 567 US at 479-480 (quotation marks and citation omitted). The Court reiterated in *Montgomery*, 577 US at ___; 136 S Ct at 734, that although life without parole might qualify as a "proportionate sentence for the latter kind of juvenile offender," that "does not mean that all other children imprisoned under a disproportionate sentence have not suffered the deprivation of a substantive right."

The focus of the analysis necessarily shifts when a court considers an appropriate sentence for an adult who was sentenced to a lifetime of imprisonment for a crime committed as a juvenile. While sentencing a young person, a judge looks forward and endeavors to predict the future. *Miller* counsels that a careful examination of the offender's developmental characteristics, his or her family environment, and the circumstances surrounding the crime help guide a determination of whether that child will ever be capable of change. Resentencing an adult requires restructuring the evidentiary review; the older the adult, the larger the predictive canvas becomes. While the *Miller* factors remain highly relevant, a judge resentencing an offender who has served many years in prison has the benefit of actual data regarding whether the offender's life in prison is truly consistent with "irreparable corruption," the only ground *Miller* specifically identified for imposing a life-without-parole sentence. See *Miller*, 567 US at 479.

Here, the trial court mentioned the *Snow* and *Miller* factors. But instead of crafting a decision drawing on them, the court concentrated its attention on Bennett's mental illness. In so doing the court abused its discretion and violated Bennett's constitutional rights.

## II. THE *MILLER* HEARING EVIDENCE

The Wayne County prosecutor requested that on resentencing, Bennett receive another life-without-parole sentence. The prosecutor supported its motion as follows: "Defendant's crime in the current case was not the result of unfortunate yet transient immaturity, but, rather, evinced irreparable corruption that requires a [l]ife without parole sentence." The prosecution called as witnesses during the *Miller* hearing the victim's two daughters. They testified movingly about the devastating impact their mother's murder had on their lives and the lives of their family members.

Both were asked whether there was "anything you would like to tell the Court about this sentencing," and neither advocated that Bennett receive another life-without-parole sentence.

The remaining two witnesses, a psychologist and a corrections expert, were called by the defense. The defense also introduced extensive documentary evidence including two psychological evaluations; COMPAS and TAP Risk assessments performed by the Michigan Department of Corrections;[3] Bennett's voluminous prison records (including misconduct reports, work evaluations, accomplishments and security classification screens); and a comprehensive reentry plan created by the State Appellate Defender Office.

The evidence established that Bennett had been severely abused—physically and emotionally—by his parents. The experts explained that this abuse deeply scarred the young man's already fragile psyche. Although the details of the crime are horrific, they reflected a "rage state of frenetic violence," one of the psychologists expressed, shaped by serious and untreated mental illness rather than sadistic depravity. Despite the childhood abuse and his underlying mental illness, Bennett's prison record demonstrates that he had a profound capacity for change. As we detail below, the experts described a man who has been successfully rehabilitated and reformed. Overwhelmingly, the evidence supported that life without parole is not a proportional sentence.

## A. THE FIRST TWO *MILLER* FACTORS

The evidence regarding the first two *Miller* factors (immaturity, impetuosity, and failure to appreciate risks and consequences, and the family and home environment) is interwoven in Bennett's case; accordingly, we consider the two factors together.

Abundant evidence substantiated that Bennett suffered profound physical and emotional abuse during his childhood. In a letter written to the court, Bennett's sister described that Bennett's father had unpredictable rages during which he struck and beat Bennett with whatever was available, including a hammer and a shovel. She described her father as "horrifically violent" toward Bennett, and acknowledged that their mother did nothing to contain the abuse. A neighbor recounted that she heard or witnessed episodes of physical abuse perpetrated on Bennett by his father. She characterized Bennett's home environment as "frightening and sometimes brutal." The neighbor expressed deep regret that she had not contacted Child Protective Services.

Dr. Michael Caldwell, a psychologist who specializes in adolescent brain development, performed a comprehensive evaluation focused on Bennett's current and past mental conditions. Bennett reported to Dr. Caldwell that in the months leading up to the offense he "felt increasingly

---

[3] COMPAS "stands for the 'correctional offender management profiling for alternative sanctions' program. COMPAS is a comprehensive risk and needs assessment system, which takes into account both static information (such as the prisoner's past criminal offenses) and dynamic data (such as the prisoner's evolving attitudes and mental condition)." *In re Elias*, 294 Mich App 507, 520; 811 NW2d 541 (2011). TAP is the Transition Accountability Plan, considered "the lynchpin" of the Department of Correction's reentry programming. *Id*. at 519 (quotation marks and citation omitted). These 2013 instruments indicated that Bennett's risks of recidivism and violence were "low."

angry and depressed" and "confused and having difficulty concentrating in school." His father's violence escalated during this time, and Bennett recalled being the target of "humiliating abuse" and bullying by his peers, including physical assaults, sabotage of his school projects, and theft of his property.

Dr. Caldwell determined that Bennett suffered from severe underlying mental illness at the time of the crime, as well as post-traumatic stress disorder (PTSD) produced by his abusive home environment. The PTSD symptoms impaired the development of areas of Bennett's brain controlling emotional impulses and moderating agitation, Dr. Caldwell explained, and stress hormones generated by his childhood experiences further exacerbated the delay in brain maturity. "These traumatic experiences would have impaired his ability to anticipate negative outcomes, generate rational plans for dealing with his emotional problems, modulate his emotions and agitation, and to avoid impetuous or irrational actions," Dr Caldwell opined, adding that "[h]is impairment in these areas would have been significantly greater than what would be the case with adolescents in general."

At his criminal trial, Bennett's attorneys recognized the young man's mental illness and advanced an insanity defense. Daniel Burress, who represented Bennett, recalled that a psychiatrist and psychologist examined Bennett and determined that he was "schizophrenic."[4] Judge Burress related that Bennett "did not receive the mental health treatment he needed" until he was imprisoned and diagnosed by prison professionals as suffering from a schizoaffective disorder and major depression. His letter to the resentencing court continued:

> I was and remain convinced that Mr. Bennett suffered from an untreated mental illness at the time of the offense. Prison records confirm that he continued untreated in the prison system for some time. Once he was properly diagnosed and treated within the prison system he has proven himself, and is a model of what the prison system wishes it could accomplish with every inmate.

> Each and every one of the 350 or more Michigan cases affected by *Miller* involve tragic circumstances. But I am certain very few if any of these cases involve previously undiagnosed mental illness and the long-term rehabilitation documented by Mr. Bennett.

The presentence investigation report (PSIR) prepared after Bennett's conviction reported that Bennett's family "realized" that he "had mental problems," but "never had him examined by a psychiatrist and agreed to let him go his own way." Bennett's mother reflected that after hearing the trial testimony regarding her son's "schizophrenic, paranoid, homicidal" behavior "and his intense hatred for women," she "realized for the first time how seriously mentally ill he is." She expressed no remorse for Bennett's mistreatment, only fear that he would "either kill himself or someone else" if released.

Bennett finally received a mental health diagnosis and treatment in prison. Initially he adjusted poorly to incarceration, and within a short time he was referred for psychiatric evaluation.

---

[4] Daniel Burress subsequently served for many years as a judge on the Livingston Circuit Court.

In 1973, Bennett was formally diagnosed with "Schizoaffective Disorder, Major Depression with psychosis, Depressive Disorder . . . with psychotic features" and began to participate in a treatment program offering medication, individual and group psychotherapy, and vocational and academic training. Bennett made excellent progress. At age 21, he returned to the general prison population. According to both psychologists who evaluated Bennett for *Miller* purposes, the records from that time demonstrate that Bennett had matured considerably. In other words, Bennett grew up—and his brain developed into that of an adult—in prison.

The first two *Miller* factors are rooted in "hallmark features" of youth. *Miller*, 567 US at 477. Bennett's immaturity and his inability to control his anger—indeed, his "seeth[ing] . . . rage," as Dr. Caldwell put it—permeated his childhood. So too did the brutality of Bennett's home environment. These factors mitigated strongly in favor of a term-of-years sentence.[5]

## B. THE THIRD *MILLER* FACTOR

The third *Miller* factor addresses the "circumstances of the homicide offense," including the extent of the offender's participation and "the way familial and peer pressures may have affected him." *Id*. Indisputably, Bennett committed a horrific crime. He was the sole participant, and no evidence suggests that peer or family pressures influenced him. Bennett personally acknowledged his role in Berry's murder, expressed remorse, and apologized to the victim's family at the *Miller* hearing.

In *People v Hyatt*, 316 Mich App 368, 420-421; 891 NW2d 549 (2016), rev'd in part on other grounds by *People v Skinner*, 502 Mich 89; 917 NW2d 292 (2018), a conflict panel of this Court placed the ghastly and vicious nature of Bennett's homicide offense in proper perspective, and we adopt that panel's reasoning:

> [N]early every situation in which a sentencing court is asked to weigh in on the appropriateness of a life-without-parole sentence will involve heinous and oftentimes abhorrent details. After all, the sentence can only be imposed for the worst homicide offenses. However, the fact that a vile offense occurred is not enough, by itself, to warrant imposition of a life-without-parole sentence. The court must undertake a searching inquiry into the particular juvenile, as well as the particular offense, and make the admittedly difficult decision of determining whether this is the truly rare juvenile for whom life without parole is constitutionally proportionate as compared to the more common and constitutionally protected juvenile whose conduct was due to transient immaturity for the reasons addressed by our United States Supreme Court.

---

[5] The resentencing judge commented that he had "taken into consideration" Bennett's home environment and specifically that Bennett's father's "disciplinary acts were kind of violent, in terms of dealing with Mr. Bennett, causing him to suffer depression and other mental health issues." The court apparently did not fully appreciate the severity of the abuse that Bennett suffered, and that Bennett's mother's refusal to intervene was, in itself, another facet of the abuse.

The resentencing court indicated that it had considered the nature of the underlying offense, but did not rely on it in any way in formulating its decision. The resentencing court did not abuse its discretion by implicitly determining that the circumstances surrounding the offense did not merit a life-without-parole sentence.

## C. THE FINAL *MILLER* FACTOR: REHABILITATION

The remaining *Miller* factor of relevance concerns "the possibility of rehabilitation." In the usual sense, "rehabilitation" involves the successful completion of vocational, educational, or counseling programs designed to enable a prisoner to lead a useful life, free of crime, when released. The evidence supported that Bennett had achieved rehabilitation. The prosecution presented no evidence whatsoever to the contrary.

Since his transfer to the general population in 1976, Bennett incurred no serious misconducts, completed a college education, and participated in a number of programming opportunities. According to Richard Stapleton, an expert on the Michigan Department of Corrections (MDOC) and its records and policies,[6] Bennett "has demonstrated that he is a responsible, worthwhile individual." Bennett successfully completed programs in substance abuse, assault reduction, and anger management, and benefited from vocational training in a cornucopia of fields, including horticulture, food service and hospitality management, and custodial maintenance, and an apprenticeship in tool and die. He obtained his Associate's degree in general studies from Jackson Community College.

Bennett held a variety of prison jobs, including as a food service worker, a greenhouse and garden worker, a janitor, a payroll clerk, and a factory worker. He experienced no difficulties at work, earned "excellent" or "very favorable" work performance reviews, enjoyed a "consistently positive work history," and developed good working skills.[7] Bennett made a point of saving money and accumulated over $40,000. Dr. Bernard Gaulier, a second examining psychologist, opined that Bennett's accomplishments reflect "amenability to treatment" and a desire for self-improvement.

During the last 40 years, Bennett has not had any infractions or tickets related to violent or aggressive behavior or serious misconduct; his last aggressive incident occurred in 1975. Stapleton described Bennett's misconduct history while serving in the prison's general population as "remarkable" and "commendable," especially considering "the circumstances under which prisoners are required to survive and the fact that they must engage 24 hours a day with other prisoners, many of whom are violent and predatory." Stapleton related that he has "known very

---

[6] Stapleton was employed by the MDOC in various capacities for more than 30 years. He began working for the MDOC as a corrections officer and earned a law degree in l986. During his career he assumed responsibility for managing the prisoner disciplinary process and supervised the administrative law judges who conducted formal disciplinary hearings. From 1999 until his retirement in 2011, Stapleton served as the Administrator of the MDOC Office of Legal Affairs.

[7] Stapleton commented that prison staff is not "routinely generous with praise in their evaluations."

few cases" like Bennett's, characterized Bennett's overall behavior while incarcerated as "exceptionally positive" and expressed that "such a positive disciplinary record reflects self-control and an ability to get along with others."

Bennett's rehabilitation is a strongly mitigating factor. The resentencing court addressed it as follows: "It's my feeling that Mr. Bennett has done everything that he possibly could do, in terms of trying to rehabilitate himself in prison. He has been an excellent prisoner." This finding is well supported in the record. Bennett's remarkable rehabilitation "demonstrate[s] the truth of *Miller*'s central intuition—that children who commit even heinous crimes are capable of change." *Montgomery*, 577 US at ___; 136 S Ct at 736. The resentencing court's recognition that Bennett "has been an excellent prisoner" strongly favored Bennett's release.

The resentencing court nevertheless elected a sentence of life without parole, stating:

> And . . . I cannot get out of my mind the fact that Mr. Bennett suffers from schizophrenia. And I'm deeply concerned about how he will operate back in society after having been gone for forty-seven years.

> I think that he's done well with his mental health issues because he's been in a very structured situation, and therefore he was able to survive. But if he's released into the community, whereby he has to go back to caring for himself, it might cause a problem.

> And, for that reason, I'm going to sentence him under [MCL 750.316], and not to a term of years.

> That's my decision[.]

We next consider the factual and legal support for that ruling.

## III. MENTAL ILLNESS

Mental illness is not a specific *Miller* factor. But it is imbedded within the first two factors: immaturity, impetuosity, and failure to appreciate risks and consequences, and the family and home environment. Untreated mental illness can lead to criminal behavior and violence. The evidence in this case supports that severe abuse and emotional neglect exacerbated Bennett's undiagnosed and untreated mental illness.

Our justice system generally regards an offender who commits a crime while suffering from undiagnosed or untreated mental illness as *less* deserving of the harshest punishments; that is the central lesson of *Eddings*. See also *Zant v Stephens*, 462 US 862, 885; 103 S Ct 2733; 77 L Ed 2d 235 (1983) (stating that in a death penalty case the decision-maker must consider "conduct that actually should militate in favor of a lesser penalty, such as perhaps the defendant's mental illness"); *United States v Doering*, 909 F2d 392, 395 (CA 9, 1990) (holding that the federal sentencing guidelines "make[] abundantly clear that the need for psychiatric treatment is not a circumstance which justifies departure").

Furthermore, although untreated mental illness may predispose to violent behavior, successfully treated mental illness does not.  The evidence in this case demonstrates that Bennett's illness was successfully treated and that he had been stable from a mental health standpoint for many years.  Next, we review that evidence.

Over his four decades in prison, Bennett suffered only a few psychiatric episodes.  In March 1981, his mental condition "deteriorated significantly" and he experienced "paranoid delusions" and "persecutory hallucinations."  He was treated with antipsychotic medications and improved.  In October 1981, Bennett was rehospitalized after responding to auditory hallucinations and making suicidal gestures.  Again, he improved after a medication adjustment.  Two months later his antipsychotic medications were discontinued and he became withdrawn, depressed, and paranoid.   The medications were restarted and he returned to his baseline.  Bennett relapsed on two later occasions, the last in 1996, but both episodes "cleared rapidly" with medication adjustments.

Bennett has received psychiatric services on a voluntary basis for the last three decades, including psychotropic medications, individual and group therapy, and case management.  He has a long record of mental stability with medication.

In October 2016, Dr. Gaulier evaluated Bennett to address the *Miller* factors and to assess his future risk for reoffending.  Dr. Gaulier noted "no indication of delusions, or of paranoid thoughts, or other indicators of psychosis," and that Bennett "did not endorse symptoms that would indicate the presence of significant mood difficulties such as excessive depression or anxiety."  Dr. Gaulier's testing assessed Bennett at a "low risk level for antisocial personality and psychopathic behaviors."  He opined that Bennett "is no longer a young and immature adolescent. He is able to think before he acts and weigh the potential consequences of his actions[,]" is at "low risk for future criminal behavior" and "understands the need to continue mental health treatment if he were released from prison."  On release, Dr. Gaulier recommended that Bennett engage in community reentry services to address his housing, financial, employment, and mental health needs.  He predicted that the "skills and attitudes" Bennett "developed through his education and his work are likely to be helpful upon reintegration into the community."

Dr. Caldwell's report and testimony also addressed Bennett's risk of reoffending.  Bennett suffered from several mental disorders at the time of the murder, Dr. Caldwell explained, and continues to suffer from "Schizoaffective Disorder, Depressive type" characterized by major depression with episodes of psychotic illness.  Bennett has not experienced a psychotic episode or instability for over 20 years; since the mid-90s he "has been stabilized with antidepressant medications . . . and is currently in partial remission, with only mild to moderate symptoms of depression that he is able to cope with without difficulty."  According to Dr. Caldwell, Bennett was doing "very well" with his current medication:

> Over the past several decades his mental disorder has been well managed with medications.  He has been highly motivated to continue the medications and was able to alert prison staff and ask for more medicine when he began to decline in 1996.  Although he continues to experience some symptoms of depression and anxiety, he has not shown the hostility, paranoid suspiciousness or rage that were central to his previous violent behavior for over 20 years.

Dr. Caldwell assessed Bennett's "potential for future violence and persistent criminality" and found "no significant characteristics of psychopathic personality." His risk assessment placed Bennett "in the lowest risk category for general recidivism" and the lower one percent of prison inmates for aggressive behavior. Bennett's risk for antisocial behavior was primarily related to his mental disorder, which Dr. Caldwell noted has been "well managed" for several decades. Bennett "poses a very low risk of any kind of future either violence or just criminal behavior in general," Dr. Caldwell concluded.

In Dr. Caldwell's opinion, Bennett "has demonstrated remarkably positive rehabilitation over his time in the prison system" and was "rehabilitated." He explained that Bennett had matured and had a "much better understanding" of his emotions, "does not harbor the sense that the world is malicious and that he has to be on guard, constantly, ready to fight back and protect himself," and "is able to just manage his stress more effectively, and, in particular, to reach out to sources of support . . . to effectively deal with it when he starts to have more symptoms." Bennett no longer has the "hair-trigger sort of anger" he experienced at the time of the offense, and has not had any aggressive incidents for over 40 years. Dr. Caldwell also noted Bennett's "remarkable degree of recognition that he needs medication" and treatment, and that he had "developed an understanding of . . . when he's starting to deteriorate, when the medication isn't working as well." His prison records confirmed that Bennett had asked for an increase in medications at times when he has felt that his symptoms were worsening, and had not refused treatment.

Stapleton, too, described Bennet as rehabilitated, remarking that he "is not a violent person, nor is he a danger to others. He is clearly not the same person that came to prison as a terrified and withdrawn 18-year-old offender." He summarized:

He successfully matured through those early years and has been an essentially problem-free prisoner over the last 40 years of his incarceration. He is now a 64-year[-]old man who has been incarcerated for 46 years. He has taken advantage of the limited opportunities he has had to better himself and clearly gets along well with other prisoners and staff. These are the indicators of a person who would readily become a productive member of our community if given the opportunity.

As an MDOC employee for over 33 years, including a Parole Officer for 10 years, I have personally witnessed and supervised the reentry of many offenders who were convicted of homicide offenses. As a group, they are recognized as having a very low rate of parole violation or return to new crime. Indeed, the MDOC's own risk assessment tools and internal guidelines agree that Mr. Bennett poses little risk of recidivism or violent behavior.

The comprehensive reentry plan developed by the State Appellate Defender's Office, Stapleton observed, reflects "that he has community support and services ready to facilitate his return to community in the event he is released." The plan incorporates community programs addressing Bennett's mental health. Dr. Gaulier noted that at present, Bennett experiences only mild to moderate symptoms of depression and anxiety and is treated with a "very widely prescribed" antidepressant that does not take a great deal of specialization to monitor. Dr. Caldwell, too, expressed that Bennett's medication and supervision needs could be managed in the community by a family physician or a social worker.

## IV. THE EVIDENCE DOES NOT SUPPORT A LIFE-WITHOUT-PAROLE SENTENCE

The resentencing court found that Bennett's well-treated mental illness trumped his rehabilitation, and that Bennett might find it challenging to live in a less structured environment. The court's unfounded speculation finds no record support.

The *Miller* and *Snow* factors weighed strongly in favor of Bennett's release. Indeed, the prosecutor introduced *no* evidence supporting that Bennett is "irreparably corrupt." "Just as courts are not allowed to impose disproportionate sentences, courts are not allowed to sentence juveniles who are not irreparably corrupt to life without parole." *Skinner*, 502 Mich at 125. The resentencing court clearly erred by ignoring this constitutional mandate. Treated mental illness is not a signal of irreparable corruption, and no evidence even hinted that Bennett's mental illness created a realistic danger that he would reoffend.

Instead of fashioning a sentence grounded in the abundant evidence that Bennett has become a productive, stable, and peaceful adult, the court resorted to a purely theoretical and uncertain prediction that because Bennett is mentally ill, he "might" "cause a problem." "A sentencing judge's exercise of discretion must be based on accurate information." *People v Smith*, 423 Mich 427, 448; 378 NW2d 384 (1985). This is a due process requirement. *People v Miles*, 454 Mich 90, 100; 559 NW2d 299 (1997). To the extent that the resentencing court made a factual finding regarding Bennett's risk of reoffending, it was clearly erroneous because no evidence supported it. Nor did any evidence support any other ground for Bennett's continued incarceration. Accordingly, we reverse and remand for resentencing to a term of years based on the present record and consistent with MCL 769.25(9). We further instruct that the resentencing be conducted with all deliberate speed.[8]

We vacate Bennett's sentence of life without parole and remand for resentencing to a term of years based on the same record, and with all deliberate speed. We retain jurisdiction.

/s/ Elizabeth L. Gleicher
/s/ Brock A. Swartzle
/s/ Jane M. Beckering

---

[8] We are aware that the resentencing judge has died, and that a new judge must be assigned the task of resentencing Bennett. Given the resentencing parameters set by the Legislature, we anticipate that the sentence imposed will result in Bennett's immediate eligibility for consideration by the Parole Board. We have retained jurisdiction to facilitate further appellate review, should it be necessary.

# Court of Appeals, State of Michigan

# ORDER

People of MI v David Leroy Bennett

Docket No. 350649

LC No. 72-055257-01-FH

Brock A. Swartzle
Presiding Judge

Jane M. Beckering

Elizabeth L. Gleicher
Judges

Pursuant to the opinion issued concurrently with this order, this case is REMANDED for further proceedings consistent with the opinion of this Court. We retain jurisdiction.

Proceedings on remand in this matter shall commence with all deliberate speed following the Clerk's certification of this order, and they shall be given priority on remand until they are concluded.

Within seven days after entry, appellant shall file with this Court copies of all orders entered on remand.

_____
Presiding Judge

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

January 21, 2021
Date

_____
Chief Clerk